Our next case is 412-1091, Ramshaw Real Estate v. Illinois Properties, Incorporated. For the appellant, it is Gary Leitz. Here he is, sir. And for the appellee, it is Lorna Geiler. Mr. Leitz, you may proceed. Good morning, Your Honors. Good morning. I am Gary Leitz, and I am with Mike Corning, the counsel of Taylor Michaels, a retired member of the Bar and Champaign County Inquiry Center, participating in the preparation of the brief and the file. Counsel, may it please the Court. Counsel. This case is about a breach of trust. A series of serious breaches of fiduciary duties owed by the agent, Ramshaw, the plaintiff, to my client, Illinois Properties, Inc., the principal. Fiduciary duty of loyalty, duty to disclose, duty to not self-deal. Some breaches are so severe, so egregious, it destroys that trust. We have one of those cases here today. Because the agent in this case, Ramshaw, was managing property that was generating hundreds of thousands of dollars a month, and the properties were worth millions of dollars. The very first pleading filed by Illinois Properties, asserted as its first affirmative defense, Ramshaw has engaged in self-dealing, breach of its fiduciary duties, relieving IPI of its obligations under the agreement. This affirmative defense was denied by the defendant. The affirmative defense raises issues of Ramshaw's faithfulness. Where an action is filed by an agent against his principal, and faithfulness is at issue, Ramshaw has the burden of proving full honesty and loyalty, or, alternatively, full disclosure of the principal and the principal's ratification. They've done neither. We're here on appeal, in great part because the trial court found that IPI had breached the contract, but the court had ignored Ramshaw's breach over an eight-year period of time for failing to disclose its 60% ownership in clean right, which is critical in this case. Now, the trial court did this in July of 2010. It was at that hearing that it became very clear, on the one hand, for Ramshaw, Todd Linhart had provided testimony in an affidavit where he said one thing, and Peter Boxer from Illinois Properties, Inc., by his testimony, said the opposite. Two different opposing positions about notice. Linhart said, testified, that he sent written notice in 2001 to Peter Boxer. I thought he said he sent it to the company. I'm sorry? I thought he said he sent it to the company without identifying an individual. In both his testimony and in his affidavit, the affidavit was more generalized. His testimony was that he knows he sent it to Peter Boxer. Now, if he sends notice in writing, we asked, our position was, and Peter Boxer's affidavit was that in August or September of 2009, he first became aware of Ramshaw having a substantial interest in clean right. And it was the first time he was made aware of that ever, in August or September of 2009. We produced that testimony by way of affidavit and presented that to the trial court, and Judge Ford heard that evidence. It was our position that if we've got someone saying, oh no, we sent you notice, and the other party says, I never received notice of your ownership of 60% of a company that you're using all the time, that is an issue of fact. It goes to the heart of the affirmative defense that was present, the affirmative defense that was filed on behalf of IPI in the entire complaint that was filed by Ramshaw. The affirmative defense was, we're dealing with a breach of fiduciary duties and a breach of its contract with IPI. Why did Linhart send out the notice? Because the statute required, if you own more than 1% Does that mean that the judge was wrong regarding referral? I believe the court was wrong in two ways. I believe the trial court was wrong when it said there wasn't a referral. I believe the court was wrong when it said that there wasn't a genuine issue of material fact on whether or not notice was sent. But if he's right about referral, it doesn't make any difference about genuine issue of material fact. If the trial court were to be correct. If the trial court were to be correct, that would be the case. However, as I know we argued in our brief, it's important to know that Linhart sent out this notice of 60% ownership because it's required by statute. And Linhart said we sent it to other customers at the same time. But he was never able to produce the copy. He was never able to produce even a copy of what was sent to others. We have no document of it, no copy of it, no record of it. It still never been produced. The trial court did make a remark about referral. And the argument that the trial court, I believe was adopting, was taking was there really wasn't a referral because according to our argument at the time, Ramshaw wasn't bothering to just refer and here's a list of two or three people you could use or a vendor that you could use. They were hitting enter on their keyboard. They were sending them out. They were dispatching them post-haste. It was expediency. They were not bothering to say, you know, well, let's use CleanRight for this. Or let's use somebody else for this. Or let's give you some choices for this. They used them. They sent them out. Were the services performed by CleanRight performed in an unacceptable manner? Was it overcharging? Was it reasonable? Is it that important? The problem, if I may, Justice Turner, is the fact that the charges that CleanRight were charging were, according to the affidavit Peter Box has submitted at the same time at the same hearing, substantially more than what others were charging for the same services. And the problem with this failure to apprise us and failure to notify us is, it had been going on since 2001 to now 2009, and this was a serious, severe breach of faithfulness between us and Ramshaw. Ramshaw was using a company it controlled, 60 percent of it, and were sending them out to do work on jobs that Ramshaw was already being paid to do and to manage. They were taking profits off of that work, whatever those profits would have been. Sixty percent of them would go to Ramshaw. That's self-dealing, we believe. And we believe that that's the purpose of 1010, both B and C. I thought Illinois properties had independently hired CleanRight as well. I beg your pardon, who hired CleanRight besides Ramshaw? No. Never? Not to my knowledge. Ramshaw was the managing agent and would be making the decisions and pushing the buttons and deciding who would be going out to do different jobs. And if, in fact, Boxa and IPI decided to hire CleanRight on a separate deal unrelated to Ramshaw property, then that's their absolute right to do that. But why would they do it if they're charging too much and doing a bad job? Well, I don't know when they did it. I'm not even admitting that they're doing it. But if they hired it, there's nothing wrong with that, of course. What is wrong is if Ramshaw is hiring a company it owns and has 60 percent of the profits from it to go out and do work that Ramshaw is already hiring on. That's self-dealing. It violates 1010C by saying that they are referring someone to IPI in which the licensee has a 1 percent ownership interest. And they're referring them to do specified services, water extraction, water damage in an apartment unit. And so, number one, Todd Leonard says, oh, we sent notice. Why would you have done that? Well, because obviously the statute requires it. But number two, we can't come up with a copy of it. We don't know where it is. And they do it for eight years. It's discovered by IPI. And IPI is going, well, this seems like a lot of bills, a lot of money for this work. And you have an ownership interest in it? I've never known that before. That's in Peter Box's affidavit. We believe that that in and of itself justifies an actual trial or hearing on this issue of the providing of notice. And we believe that the trial court erred by rejecting that and saying no need for that, not necessary. We think it's a rationalization. We think it's illogical to say they never really referred CleanRight. They sent them out without discussion. They sent them out without any kind of pre-recognition or any kind of referral discussion or anything else. They just went and shipped them out. Go out and do this work. And that is a referral with expediency. It's dispatching them to do it. And that's why we disagree with the judge's finding about, well, there's not really a referral here. In fact, there was a referral. They just did it unilaterally. And they never notified us that they owned 60% of the company. We believe that Act applies, 1010B and C, on this very issue. Yet the whole purpose is to let a client, IPI, know, look, you're hiring me to do property or services relating to real estate. And that real estate, it might be title services. It might be cleanup work. It might be managing your property for you. You need to disclose to us, licensed agent, if you own more than 1% in a company that you're referring or sending out to do work that you're already being compensated for by the principal. Ramshows are already being compensated under a variety of different ways under this agreement. Well, but they're supposed to be compensated. That compensation has absolutely nothing to do with the issue. There's a contract that says it, and there's nothing wrong with that contract. That's not the issue. The issue is, while you're getting compensated, you're also self-dealing, and you're going to make 60% profit on anything of a company that you own that you haven't properly noticed and disclosed to your principal for whom you have a duty of loyalty. We believe that, given those facts, the trial court should have had this matter set for hearing and should not have entered summary judgment, especially, particularly, absolutely, in light of the presence of an affirmative defense that has been denied by the defendant on this very issue of fiduciary duty. This was a material, to me, a major misrepresentation, a misrepresentation by omission. They didn't tell us what they were statutorily and common law required to do under the law. Five months earlier, the trial court entered a partial summary judgment. We believe that that ruling is an error as well. Oddly, Ramshaw's attorney, the agent's attorney, filed a motion for partial summary judgment asking the trial court to use money that had been collected by Ramshaw as rent in October of 2009 and to take that money and to pay eight creditors. They specified who the creditors were. I'm sorry, eight vendors. There was never a hearing on this. There were motions and pleadings filed. But the trial court decided that these vendors' positions regarding amounts due, that they should be paid out of IPI's money. Ramshaw, the plaintiff, is the agent. And now it's taking the position of these eight vendors and saying, Your Honor, these people need to be paid. And we don't need to bother with a hearing. We need to have summary judgment. We need to be authorized and allowed to pay these vendors. Their duty is to their principal, LLI property. But they're saying that these eight vendors need to be paid. They've collected about $190,000 and we want to take some of that money and pay it. Now, of course, the money belongs to IPI, but the trial court allows that motion for partial summary judgment. And all eight of those vendors are paid. No hearing, no trial, no prove-up by the vendors. The vendors aren't parties to the lawsuit. The vendors aren't present in court. They don't even have to testify as to what they are owed. This is a motion for partial summary judgment that's asking the trial court, Take some of IPI's money and pay these vendors. I know I'm the agent for IPI, but I want these vendors to be paid. That's done. I don't know, but it seems to me... Did you challenge the vendors' claims? I beg your pardon? Did you challenge the vendors' claims? We had no chance to challenge anything. It was a motion for summary judgment asking that they be paid. There was no hearing, there was no trial, there was no opportunity. Maybe I'm not being clear, counsel. When a motion for summary judgment was made asking if the vendors be paid, was your response saying, wait a minute, some of these may not be legit. We don't want to pay them. I believe that that was, in fact, made, but I know that Mr. Pope was representing. At the time, I was not. I don't know exactly what was in there. What I do know is Mr. Pope, Dan Pope, was counsel for IPI at the time. Well, would that make a difference? I mean... I think it would make a difference in the sense that they simply said, this shouldn't happen because we don't know if these are reasonable or proper or approve of, and could we please have a hearing on that. Absolutely, that should be done, and I believe that Mr. Pope, counsel, would have done so. But the fact is, there was never even so much as a prove-up of those damages, and the effect of the ruling by Judge Ford was, these vendors are going to get paid. They're going to be paid with the principal's money. It's effectively a judgment satisfying these vendors' claims, and there's never been a prove-up. The vendors aren't a party to the case. I don't know how the trial court had jurisdiction to do that. Well, the court has jurisdiction. The court has jurisdiction. It may not be properly entering that order, but the jurisdiction is that everyone's before it, counsel. But with jurisdiction, in some respect, the vendors weren't before the court. It was just the agent and the principal. Right. And the agent is asking to take this action. And for that reason, I don't know that the principal had an authority to challenge those vendors on the validity of the bills, if there was a substantialness of them, or for that matter, if there was a subsequent warranty problem, who they would go see. So the judge ruled all eight of them were paid. Within days after that order, Ramshaw paid itself $80,500. Two checks. It's in the record, page 696 of the record on appeal. There's a listing of all the checks that Ramshaw paid out of a trust account that Ramshaw said in an affidavit it created for the benefit of Illinois properties. It didn't benefit Illinois properties at all. All the rent money, $190,000, they put that money in their attorney's trust account, and they paid those eight creditors. And then they proceeded to pay everybody else until there was nothing left in that trust account. Not one dollar goes back to the principal. Is this during a period of time that because of the litigation between the parties, they were providing the services that they'd previously been providing? The contract had been terminated by order and by agreement, stipulation as of October 9 of 2009. This ruling on partial summary judgment came in February of 2010. Judge Ford said you may pay these eight creditors. One of the creditors for things that were done prior to October 9? They were for things. Well, Ramshaw was paying itself for its services. For the period before October 9 or for the period after October 9? Before October 9. Well, until it was terminated, you're talking about a fiduciary obligation. Don't they have a fiduciary obligation to pay the vendors that they contracted with and told, if you do these services as the agent of IPI, they'll be paid? The contract provider, if anything, was over $500. They had to pay. Number two, though, they may have had authority to go and pay other vendors, but in this case, they've gone into court and told the judge, we're going to leave this $90-some-thousand left after we pay these vendors. And we'll argue about that later on between Ramshaw and IPI. Based on that, made a ruling saying, okay, pay these eight vendors. Then they went out and, ignoring that, paid themselves and they paid CleanRight. And in December of 2011. Well, until it's decided that they shouldn't pay CleanRight, CleanRight was one of the vendors that he said you could pay. Well, no, it wasn't. They were not one of the eight vendors that they were authorized to pay. Not at all. Why not? I don't know. It was their petition asking to pay these eight vendors. CleanRight was not among them, and neither was Ramshaw. These were separate vendors, not parties to the case. We know they're not parties. And if I may, Justice Connect, I believe that what count six was filed by the plaintiff was trying to say was we never got paid the $80,000 when, in fact, they had been paid. They'd paid themselves. They'd written themselves a check. We had filed our count three of our counterclaim was conversion in Trova. They've taken $80,000 and another $12,000 of our money, and they've handed it over to themselves and paid themselves. Plaintiff tried to get summary judgment on our count three counterclaim, and we brought it to the judge's attention. They've paid themselves beyond what you authorized them to do, and the judge specifically said this goes beyond what I authorized you to do, and I have problems with this, and no, this must be litigated. Soon thereafter, the judge did a 180-degree turnaround. Two times up, Mr. Leach. You have an opportunity to address this again. Thank you. Ms. Gatlick? Thank you, Your Honor. Great. Please support. Counsel? Certainly I had prepared remarks, but I'm going to just skip that and go right to the issues here. Fine. A couple of things. I'm curious as to what the point that Mr. Leach was just talking about. What's your response to that? The count three, count six issue? Yes. My response to that is he's partially right. He wasn't there, and if you look at the order, you'll see the order. Judge Ford issued an order saying you can pay these vendors, and Your Honor, just to be clear, you have it right. We contracted. We were supposed to contract to take care of these properties. We did. And then IPI said you can't pay anybody anything else without us cosigning. Boom. We had to stop paying people. We cut all these checks, and it's in the record, but we cut all these checks, and we sent them to Peter Boxa and said, okay, here's the invoices. Here's the checks. You sent them to whom? Peter Boxa, who was a principal in IPI. Okay. Go ahead. Sorry. So here are the checks. Here are the invoices that go with these checks, and it was kind of big stuff because it was during that turnover time, college campus turnover of apartments, August of every year. So you said we couldn't pay any of these bills under our management agreement anymore, so here they are. So we send them to him thinking that he's signing them and sending them off. He's sitting on them. He's not sending them and signing them. So then people we have contracted with to clean carpets, to paint walls, to take trash, whatever it is, are calling Ramshaw and saying, you've got to pay your bills. You've got to pay your bills. You're the management company. You hired us. You've got to pay your bills. No, these are IPI's bills. Well, but you hired us. So that's how it gets teed up in front of Judge Ford. Can we pay these people? Because at that time, Dan Pope and I were trying to, these are the people we should pay, and we just hit a wall. No, Pope did not contest the validity of those particular invoices. He did not. Was there any claim ever raised before the trial of Judge that some of these invoices might not be accurate or legitimate or anything else? Just clean right. I don't want to misrepresent. Just clean right. But no, not as to made right cleaning or John Doe painting. No, not at all. Did he have an opportunity to dispute or ask for some evidence as to why the vendor's bills were legitimate? Absolutely. First of all, he asked me. Now, that's not in the record. But anybody who knows me knows I gave it to him. Secondly, I filed a motion for summary judgment when he's not moving. And we all know the process, and Mr. Leitz used the process from time to time in this case. If you don't have what you need to properly respond to a motion for summary judgment, you file an affidavit under 191 and say, I don't have what I need. I need more time. I need discovery. There is a mechanism in the code for that. It was not used by Mr. Pope. So the summary judgment gets entered. And the summary judgment by Judge Ford was, yeah, you've got to pay these vendors. And that is what he authorized. Mind you, he had never said this $192,000 that we had kept. We got it. It was collected from IPI rents. But it needs to go to people to pay bills. He had never said, Ramshaw, you can't disperse that. No. Nor had we ever promised not to disperse it. We were trying to do it the gentlemanly way. It wasn't working, so we end up with a summary judgment on the eight independent vendors. As a part of all this, Judge Ford said, look, IPI, you breached the contract. You owe the money. We'll talk about future damages later, but you breached the contract and you owe the money.  As a part of that reasoning, Ramshaw decided, with my guidance, this is equally applicable to you. You were never told, we were never told to hold this in trust. We were never told to interplead this or anything like that. We never had an agreement that that's what we were doing. We were trying to make sure we spent this money correctly. We truly believed we would duke it out over this money as it related to management fees and or clean rights stuff, because that's what he was complaining about. Mr. Box was complaining about. We were duking it out about everything. So, looking at Judge Ford's order at that time, Ramshaw decided, look, if the logic was these fees, cost expenses were incurred, pay these bills, the management fee is what it is. I mean, it's a multiplier. There's no real issue on that. So, we're taking our management fee. Clean rights bills are what they are. We're paying clean rights. Absolutely, that's what he did. Did we run the risk of having to pay that money over sometime to IPI? If IPI established that clean rights didn't do the work? If clean rights separate, sure. Did we run the risk of having to disgorge those management fees? If, for some reason, Judge Ford would have found we violated the contract somehow before IPI did? Yep, we did run that risk. But it was a risk, that's all. So, that's what happened, Judge Steigman. We, quite frankly, looked at it and said, look, this is the same issue. And management fee is even more clear than whether or not Maid Right did this work for this property. It is what it is. It's a multiplier of rent. So, that's an easy one. And clean right is a third party. There's nothing in the record. I mean, the record is huge. You guys have seen the record. But I do not believe Todd Leonhardt ever said, I gave IPI the notice because the statute required it. I don't believe he said that. He said he gave the notice. And the reason he gave the notice is a great marketing tool. We can control the costs here because we have this relationship with clean right. He said he gave the notice. What about the argument that clean right was charging more and other problems with it? If you look at Peter Box's affidavit, first of all, that's the only problem with it. There was never an issue that they didn't do a good job. If you look at Peter Box's affidavit, it was a conclusory allegation that others are doing this cheaper, I'm sure of it. There was no evidence at the summary judgment. Well, so his affidavit was conclusory and not complicit with 191A? Right. And I think it might even have had that paragraph stricken. Well, that was going to be my question. If an affidavit submitted in support of or in opposition to a motion for summary judgment contains improper stuff or an allegation that is conclusory or editorial comment or something, it seems to me that the opposing party has a duty to move to strike it, to call to the trial court's attention, and to raise that issue. Did you do that? I didn't know he was going to argue that until here. It wasn't in the brief. Well, that was not my question. I think I did. I didn't have time to look at it here. I know that I filed motions to strike Peter's affidavit, paragraphs in his affidavit. I know I did that. Okay. I know I did that, I think even more than one affidavit I did that for. What did Judge Ford rule? He granted motions. He what? He granted those motions. They were conclusions. So, in other words, But you're saying you don't have a specific memory of that allegation being stricken. That's correct. It will be in the record. That's absolutely correct. But you believe it was. So, in other words, essentially the argument against Clingwright, that we've just now heard about they were charging too much, was stricken from the affidavit, so we don't have any such evidence before Judge Ford or before us. I can't say that unequivocally because I haven't looked at the record, but I believe that. Okay. Because I would not let a conclusive allegation go without a conviction strike. Well, I'm interested in whether or not that's a referral. It's not. I mean, this is all such a red herring in my mind. Okay, so we have the Real Estate License Act, and it says, well, and I brought it up here so I could read it because I'm not good at paraphrasing. If a licensee refers a client to a third party in which the licensee has greater than a 1% ownership or from which the licensee receives or may receive dividends or other profit-sharing distribution other than publicly held for the purpose of the client obtaining services related to the transaction, then the licensee shall disclose that fact to the client. So what would be a referral? If we would have said, if Eunice Kim, Peter Boxa, would have called and said, hey, do you have a referral for, I don't know, carpet cleaning, water extraction? Yeah, we use Clingwright. Now, you should know that we're a partial owner of Clingwright. I think we'd have to then. Really, if you look at the real estate, I think it would apply. If you are the management and you make a decision to secure services from a vendor, your position would be that's within your authority. That is not a referral. Absolutely. And that maybe the owners might like to know that, but you weren't obligated to disclose it. I think that's absolutely right. Because you've got to understand, or you need to understand, I'm sorry, that we have a contract with this owner. And this contract was a negotiated contract, and it gave the management company, Ramshar Real Estate, the absolute, unequivocal discretion to make those choices. If he didn't want to give us that kind of power, he shouldn't have given us that kind of power. So, no, we don't. Now, if it was, hey, we're going to use, we think you should use Clingwright on the properties. I mean, it's almost how Mr. Leeds explained it. We think you should use Clingwright on the properties we manage. No, that's not how it works. Clingwright, go. And I don't care if you call it push enter or whatever. Clingwright, go clean up this mess. Clingwright, we've got a water leak again, a rain leak through the roof, which you'll find when you look at the record. IPI doesn't think that's an emergency. That requires immediate attention. So we've got a rain leak from the roof. Clingwright, go in and clean that up. Yeah, we did do that. Yeah, and the record will show you we negotiated good rates with Clingwright for our properties. The Ramshaw properties, the IPI properties Ramshaw managed, and the other properties that Ramshaw managed on behalf of other landlords. They negotiated the same rate for all of them. So IPI got the benefit of that rate. There was nothing. You can say, I mean, we could sit here, and that's kind of what happened in the trial court. You know, they breached this fiduciary. They should have told us. No, they didn't need to tell you. No, they weren't required to tell you. But Judge Ford kind of got to the point with, so what? What's your damage? Because you have a breach of fiduciary. Let's assume we breached the fiduciary duty by not telling you something. What's your damage? Doesn't stand alone. What's your damage? Was it a material breach so as to justify you terminating this contract? Terminating this contract, mind you, after you'd already hired somebody else to manage these properties. You understand that, right? At the end of August, they entered into another exclusive management agreement. With whom? Green Street Realty. When was that to begin? September 25, 2009. So August 31, 2009, Green Street, IPI sign off. We got an exclusive management agreement for some of these same properties. And mind you, IPI is managing some of its own properties throughout both of these relationships. So August 31, September 3, Don Parkinson sends a notice about missing furniture that they can't find. And we're telling you, we're giving you 60 days notice of termination. I don't know how that math works. Because that's September 3, and we've already hired Green Street to be the exclusive rep September 25. Who sent your notification? IPI's then attorney, Don Parkinson. Sorry. Go ahead. So then Ramshaw's like, what? Missing furniture? So they have a meeting on September 10th with the Ramshaw folks and the IPI folks. Here's where this furniture came in and here's where we put what you let us have into your properties. Let's go look. And Eunice, remember, you took some of those pieces of furniture and put them in the properties you managed. Let's go look. The next day, you end up with it on September 11th. We end up with an email from Eunice, or Mrs. Kim, Miss Kim, to Todd Lindhart who says, thank you for meeting with us yesterday. We just wanted to know where the furniture went. We'll work with the insurance company to re-inspect and close the file now that we know where things are. September 11th. September 11th. Another lawyer for IPI sends a notice of default. This time it's Bill Goldstein. Ramshaw, you've defaulted. And you've defaulted by refunding someone's rent in July and something else and something else. And you've got 10 days to cure under the contract. Oh, and the furniture. You've got 10 days to cure under the contract. And if you do cure within that 10 days, we're referring you back to Mr. Parkinson's notice of 60 days termination because we're going to rely on that if you cure within 10. We never had a chance. There was no intention. There was no material breach at any time by Ramshaw. IPI figured a better deal with Green Street. And I get that. And that's okay. Business is business. Green Street's going to charge you less. But that doesn't mean you're not going to pay for your breach. You can breach, but you've got to pay for your breach. What did they need to pay? Well, clearly they needed to pay. The real issue probably, or the real issue I always thought, was the prospective damages. What are those prospective damages? I mean, Justice Connick, you caught that, yeah, those things that you paid, that we paid Ramshaw, were for work incurred, for charges incurred. So the prospective damages are really the issue that I thought we would have, but not every single thing we would have an issue about. And the prospective damages we did argue about. And we argued about what's net versus gross. Let's talk about that. There was something called maintenance labor fees and turnover expenses. Can you walk me through both of those elements of damages? Because I frankly had a hard time understanding why they were awarded and what precisely you were arguing. Okay. Well, I'm sorry for that. That's probably my shortcoming, not yours. The maintenance fees, we've got maintenance guys. So, you know, we have tenants, IPI tenants, other people's tenants, and we've got maintenance guys who will go out and fix a lock, change a light bulb, those kinds of things. We had a negotiated rate, which the record shows, I know the record shows in the record, IPI had a lower maintenance rate than anybody else that we managed for. We have a specific set rate that we charge for the maintenance guy to go change a light bulb, an hourly rate. And you build a profit into that. And we build a profit into that. That's absolutely correct. And then at the end of the month, we have the tickets for IPI property, and we bill IPI for that, and IPI pays for that. And a part of that is profit. So, historically, it is what it is. Future-wise, Mr. Leitz pointed out, and I think correctly pointed out, hey, that's not all profit. You've got to back out your costs. So we did. And that may be where part of the confusion lies. We backed out the cost of the employee, their wages. We backed out their federal and state withholding tax contributions, the employer kick of the tax contributions. So you're entitled to those damages even though no maintenance was performed? The profit, he said it. That seems odd to me. When we entered into this agreement in 2008, 2009, 2008, we were going to make money off of IPI. Would you make the same argument then on the turnover expenses? Yes. Even though there was no turnover? There was a turnover. Oh, I see it. I'm sorry. No regular turnover. I'm sorry. I got you now. I'm following you. But if you had, if they had, according to you, not breached, there would have been a turnover. You would have made a profit on that as well? Yes. Absolutely. So your argument is the turnover expenses is the same one then as the maintenance labor fees? Absolutely. But the judge treated them differently. Well, because the turnover expenses are group expenses that are divided amongst all the landlords proportionately. I always mess up, prorata. So if you've got ten units and you've got five units, you pay two-thirds of the cost and you pay one-third. Okay? Because we're turning over every apartment within a week, hundreds of apartments. So the dumpsters are going to be divided, one-third to you, two-thirds to you. The truck rental to get the old stuff out and the new stuff in, one-third to you, two-thirds to you. That's how it works on turnover. Maintenance is different. Maintenance has those little sheets. Okay? So that's why the judge kind of treated it differently. But as a practical matter, and turnover is kind of like, to some extent, a management fee. We got in this big argument about, well, you know, your management fee should not have been so high. Or your management fee can't be all profit, which is what you're arguing, Guyler. You're arguing it's all profit. I'm saying, yeah, it is all profit. Because we have this window. And we've got to have so much staff, we have this many units, and we don't have to add to that staff until we get up here. The loss of IPI still kept us in here, where we still needed this much staff. So, yeah, really, that was all profit. And it's the same as true for turnover. That's what I probably inartfully said in my writing, and I'm probably here again today. But that piece is all profit. Maintenance is just an hourly charge. It's different. Turnover is more akin to the management fee. Okay. Thank you, Counselor. Your time is up. Thank you, Your Honor. Mr. Weinstein, are you available, sir? Okay. Counsel had made the remark that we were partially right in our description about the $80,500. The fact is that they argued to Judge Ford and tried to persuade Judge Ford to pay four vendors, none of whom were clean right. They asked Judge Ford for authority to pay those eight vendors. And in doing so, they said after the third-party vendors are paid, IPI and Ramshaw will ultimately have to fight for the remainder of the money currently held in trust. Judge Ford said on page 22 and 23 of the Record of Proceedings on You said you were going to have that money duped out later, and instead you went and paid Ramshaw, your client, and you paid clean right that they controlled, $92,000. And that's not what I authorized to be paid, and that needs to be litigated. We had filed a counterclaim, count three, for conversion over these very funds. That was at the very beginning of the case. The December argument of 2011, where Judge Ford made that ruling, saying you shouldn't have done that, that wasn't my ruling, was in response to a hearing that was on the motion for summary judgment on our count three of the counterclaim. And the judge denied their summary judgment request and said it needed to be litigated. The plaintiff at that point in time filed their count six, and their count six said we have not been paid the $80,500. They attach an affidavit of Jerry Ramshaw that says what? Paragraph 11. This is in October. This is 1310 of the Record. The amounts paid by Ramshaw to third-party vendors, when combined with the management fees, maintenance, labor, materials, turnover services, and marketing fees incurred, reduce the funds to zero. Now, and he attaches from page 1311, or 1330 I think it is, and from page 696, the list of all the checks that were paid, including the ones that they paid to themselves in the cleanroom. So the attachment to their count six says they were paid. Their count six of their complaint said they weren't paid. What about the argument that occurred earlier about the affidavit? You argued to us that the evidence showed that CleanRight was charging an excessive fee. You heard the discussion. Ms. Garland says there was a motion to strike that as being a conclusory statement improper under 191A, and she says she believes it was granted. Is that right? I believe that there were motions filed by both of us. With respect to that particular paragraph, I'm not sure that that one was stricken, but I know the one that wasn't stricken, and that was the one where Peter Boxer said, I never received a notice. That's a different one now. CleanRight. Because if that was stricken, you shouldn't be arguing that to us, Counsel. But there's no evidence in the Record before the trial court of this court that CleanRight was charging an excessive fee. It will be in the Record. I don't remember whether or not that was stricken or not. Is it disputed that your client entered into an exclusive management agreement at the end of August? No. Explain to me how that isn't a breach. Well, we believe that that may have been a breach, but it's our position that what CleanRight, I'm sorry, what Ramshaw had done back in 2001 was a bigger breach. It was a breach of trust. Which was what? There was a finding that there was a breach by the FBI. Mr. Bates. What did they do in 2001, which was the bigger breach? They failed to notify us under the statute. They failed to tell us that they owned the securities. So if we conclude 1010 doesn't apply, then they've done nothing wrong? Well, if it's your ruling that 1010 doesn't apply and that they don't have a duty to notice, then of course we have an objection to that because we think that's what the law does require. But if you find that that's the case, then no, that would be a breach. I have to say that with respect to damages that was brought up, and this is important, turnover is a reimbursable expense that is divided or prorated amongst all the units that Ramshaw was doing every summer on the U of I campus. Linhart had testified or put in an affidavit that 20% of their units were IPI products. They would not have to do turnover for two more years. That is a dollar-for-dollar reimbursable item. If they're trying to charge profit on charge of an expense, that's not right. The turnover expense would not have been incurred, 20% fewer units for them to do. Okay, time is up. We're going to take this matter under advisement and be reassessed.